NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Mala Sundar**
**PRESIDING JUDGE**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625
Telephone (609) 815-2922
taxcourttrenton2@judiciary.state.nj.us

June 7, 2024

David B. Wolfe, Esq.
Skoloff & Wolfe, PC
Attorney for Plaintiff

Matthew Goode, Esq.
Arbus, Maybruch & Goode, LLC
Attorney for Defendant

Re: Twin Lakes Realty, LLC v. Township of Aberdeen
Block 154 Lot 10
Docket Nos. 002975-2018; 007352-2019; 009610-2020; 008256-2021

Dear Counsel:

This opinion decides plaintiff's summary judgment motion and defendant's similar cross-motion. Plaintiff asks the court to find that the assessment of $18,670,700 imposed on the above-referenced property (Subject) for tax year 2018 be declared an unconstitutional spot assessment. This is because, plaintiff argues, the assessment increased by over 100% from the prior tax year and (1) the magnitude of the increase was solely due to sale of the Subject, an apartment complex, on November 29, 2016, for $26,960,000; (2) the assessment changes for tax year 2018 to the other apartment complexes in defendant taxing district were only between 2% to 20%; and (3) defendant's assessor had no independent basis or new information to justify the magnitude of increase to the Subject's 2018 assessment. Plaintiff seeks an Order restoring the Subject's 2018 assessment to the 2017 assessment amount of $9,029,400.

Defendant, Township of Aberdeen (Township), contends that it is in Monmouth County which participates in the Assessment Demonstration Program (ADP). The Monmouth County Board of Taxation (County Board) implemented the ADP under certain policies, one of which, the Township notes, is that its assessor must annually reassess every property at 100% of its purported market value. The assessor here, the Township contends, performed this exercise for the Subject, and for all the apartment complexes in the Township for tax year 2018, using owner-provided information in estimating income, and applying the same income-approach methodology with uniform adjustments in setting their assessments. Therefore, per the Township, the Subject's 2018 assessment is not, and cannot be, constitutionally infirm, and its complaints should be dismissed.

For the reasons more fully stated below, the court agrees with the Township that its assessor did not single out, nor discriminate against, the Subject when reassessing it for tax year 2018. That the reassessment resulted in a higher assessment amount for the Subject, as compared to other apartment complexes in the Township, does not state, nor demonstrate, a case of spot assessment. The court denies plaintiff's summary judgment motion. It partially grants the Township's cross-motion for summary judgment as the complaints will not be dismissed but will proceed to trial.

**FACTS**

The facts are those undisputed in each party's pleadings, and the undisputed documents in support thereof, plus as obtained from the testimony of the Township's assessor adduced at his depositions and at the court-scheduled plenary hearing.

The Subject is a 9.08-acre lot improved by a 148-unit garden-style, two-story brick apartment complex, comprising of 13 buildings, built in 1970. It is classified 4C (multifamily)

and is one of ten apartment complexes in the Township.[1]  According to the property record card (PRC), the total gross building area (GBA) of the ground floor was 214,480 square feet (SF) (107,200 SF ground floor times two).[2]

Plaintiff, Twin Lakes Realty, LLC (Twin Lakes), purchased the Subject for $26,960,000 on November 29, 2016 (thus after the October 1, 2016, assessment date for tax year 2017).  The sale was deemed to be an arms-length transaction by the Township's assessor (i.e., he did not deem it unusable under N.J.A.C. 18:12-1.1).

For tax year 2018, the Township's assessor imposed an assessment of $18,670,700 on the Subject.  This amount was approximately 100% greater than the prior year's assessment of $9,029,400.  Twin Lakes challenged the assessment before the County Board, and then appealed its judgment affirming the assessment to this court.  Twin Lakes form complaint to the Tax Court only alleged that the assessment was not the Subject's true value.  The Township counterclaimed.[3]

---

[1]  Apartments "designed for the use and enjoyment of five families or more" are classified as 4C. N.J.A.C. 18:12-2.2(g).

[2]  The PRC was created by a third-party entity as part of its inspection process for the Township's 2009 district-wide revaluation.  It itemized the total ground floor area of each of the 13 buildings, and their sum total as 107,200 SF.  However, Twin Lakes is correct that the sum total should be 62,520 SF, which times two (for the second floor) would provide a GBA of 125,040 SF.  The PRC set the Subject's assessment at $14,579,100 (allocated $5,920,000 to land and $8,659,100 to improvements), and $40,000 per apartment, noting that there was no "I&E" (income and expense, also at times called Chapter 91) information.  The $40,000 per apartment appears to be the land value per unit ($5,920,000 ÷ 148 units).

[3]  Twin Lakes also directly appealed the assessments for tax years 2019 through 2021 (subject of the instant motions) which were $20,052,000; $20,052,000; and $20,178,800 respectively, to this court alleging only that the assessments were not reflective of the Subject's true value.  The Township did not file counterclaims.

Parties then engaged in discovery including two depositions of the Township's assessor. The instant motions followed. The court scheduled a plenary hearing, wherein the Township's assessor testified (subject to direct and cross-examination). Almost all of his testimony mirrored his deposition testimony except for a few clarificatory answers to the court's questions.

As noted above, there are ten Class 4C properties in the Township. The parties agreed that three are most similar to the Subject in terms of age (circa 1970s) and condition (average), and of the three, two are additionally similar as to number of units. They are: (1) Tree Haven (Block 154, Lot 16), a 140-unit apartment complex built in 1964 on an 8.81-acre lot, with a GBA of 126,296 SF; (2) Chelsea Village (Block 154, Lot 18), a 160-unit apartment complex built 1966 on a 10.58-acre-lot with a GBA of 131,620 SF; and (3) Heritage (Block 117, Lot 17), a 66-unit complex built in 1974 on a 6.8-acre lot with a GBA of 61,896 SF. Their assessments were as follows:[4]

|   | Property | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| 1 | Subject (148-unit) | $ 8,825,000 | $ 9,029,400 | $18,670,700 | $20,052,000 |
| 2 | Tree Haven (140-unit) | $10,071,600 | $10,369,400 | $12,397,900 | $11,512,300 |
| 3 | Chelsea Village (160-unit) | $ 9,871,500 | $ 9,975,400 | $11,670,300 | $ 9,377,100 |
| 4 | Heritage (66-Unit) | $ 6,475,900 | $ 6,593,500 | $ 7,056,100 | $ 6,515,100 |

The assessor stated that while he was aware of the Subject's sale, he did not use it for tax year 2017 because it was "too late" (i.e., it was post-assessment). He noted that a sale is usually the best indicator of the market, therefore, he would not ignore it, however, he would use an income approach in setting its assessment if a commercial property. He clarified that he would not analyze a property "solely with respect to" its sale unless there was something about the property which

---

[4] The 2009 revaluation-generated PRC for Tree Haven set its assessment as $9,549,900 (allocated $5,600,000 to land and $3,949,900 to improvements), and $40,000 per apartment. The $40,000 per apartment appears to be the land value per unit ($5,549,900 ÷ 140 units).

For Chelsea Village, the 2009 revaluation-generated PRC set the assessment at $12,600,300 (allocated $6,400,000 to land and $6,200,300 to improvements), and $40,000 per apartment. The $40,000 per apartment appears to be the land value per unit ($6,400,000 ÷ 160 units).

was not found in its PRC (such as a different square footage), but even then, he would correct the discrepancy and then apply the income approach. This way, he said, he "cover[s] all [his] basis" (sic) and ensures uniformity in "adjustments" for all commercial properties. He stated that this was how he analyzed the Subject's sale vis-à-vis its 2018 assessment, using available pre-sale, Chapter 91 income information with one additional factor, namely, restoring an assessment reduction due to prior years' tax appeals settlement.

He pointed out that for the tax year 2018, he reassessed all of the 197 commercial properties, including Class 4Cs, in the Township as required under the ADP, and in the process, made assessment changes to 168 of them (or 85.28%). The Subject's assessment was large, he stated, due to the removal of a judgment and its subsequent reassessment with a higher potential gross income (PGI) per square foot (PSF) under an income approach for the Subject's large GBA. A higher PGI was justified, he said, due to market appreciation in the Township.

He explained that he "removed" a judgment of $5,549,700, which represented an assessment reduction due to a prior judgment resulting from the settlement of prior tax year appeals for the Subject.[5] He explained that such types of assessment reductions are carried forward every year in the database as a "deficit," and cannot be deleted other than by moving them into the regular assessment column. This would occur, he said, when market changes require assessment changes. The "sequence" he said, "is to remove the judgment and then reassess the property." Thus, he stated, here the Subject's approximate $14 million original assessment for a prior year was reduced

---

[5] For tax years 2009-2011 (Tax Court docket number 002485-2009; 001393-2010; 003826-2011), the Subject was assessed at $14,579,100. Pursuant to a settlement, the assessments were reduced to $13,000,000; $12,000,000; $11,000,000 respectively, with an agreement that tax year 2012 would be assessed at $9,000,000. The $9,000,000 assessment carried forward through to tax years 2013 to 2015 but not due to application of the Freeze Act, N.J.S.A. 54:51A-8.

to $9 million, so the approximate $5 million difference (assessment reduction) was carried forward as a deficit. In 2018, the assessor said, he "removed" the deficit and then reassessed the Subject based on an income approach.[6]

The assessor conceded that the ADP was effective in 2014, and that he did not add back the deficit for any tax year until tax year 2018, and even when he changed the Subject's assessment for tax years 2016 and 2017. He decided to "put the judgment amount back in" for 2018 because, he said, the "market at that time had gotten better." He agreed that based on the ADP's goals, which is for assessments to reflect 100% of market value, the Subject's assessments for tax years 2014 through and including 2017 represented its "100% market value." However, he stated, the Subject was under-assessed as evident from the $5 PSF multiplier he had used to set the Subject's assessment for tax year 2017, since it was almost 50% lower than the PSF multipliers used in Tree Haven and Chelsea Village under his income approach for that year. See n.7.

The income approach, the assessor explained, entailed using a PGI, which is computed by multiplying the GBA times a PSF cost multiplier, then deducting allowances (vacancy, expenses, reserves), then capitalizing the resulting net operating income (NOI) by a capitalization (Cap) rate. The PSF cost multiplier, the assessor explained, was to provide a number that would be close to the property's reported income (from the Chapter 91 responses for that property, or none was forthcoming, then based on income reported for similar properties). In other words, he used the multiplier (cost or GRM, which means gross rent multiplier) "to mimic the PGI to come to a

---

[6] The County Board apparently requires this sequence. Its November 29, 2018, presentation stated that a "policy was adopted to expect that all prior-year judgments would change year-over-year to the amount observed with the immediate sub-market (neighborhood/VCS). Using ADAM 360 tools, the [County] Tax Board reviews the percentage change of the prior-year [County] Tax Board judgments. Any change greater than 5% may require an explanation from the Assessor."

number" and after that used the traditional income approach. The computation for the Subject's 2018 assessment was thus:[7]

|  | SQFT | COST |  |
| --- | --- | --- | --- |
|  | 214,400 | 13.75 | 2,948,000 |
| PGI |  |  | 2,948,000 |
| VAC/LOSS @ 5% |  |  | 147,400 |
| EGI |  |  | 2,800,600 |
| EXP @ 40% W/RESERVES |  |  | 1,120,240 |
| NOI |  |  | 1,680,360 |
| CAP AT 9% |  |  | 18,670,667 |
| 17 VALUE |  |  | 9,029,400 |
| DIFF |  |  | 9,641,266.7 |
| NEW VALUE |  |  | 18,670,667 |

In this connection, it is undisputed that the assessor did not receive a Chapter 91 response for the Subject for calendar year 2017. Due to this, the assessor resorted to the Chapter 91 response received from the Subject's prior owner, which reported $2,545,340 as actual rental income; $18,837 as actual other income; 5% vacancy rate; and $2,936,160 as potential rental income for the calendar year 2016. The assessor stated that he used the reported potential rental income amount (his computation sheet had a notation "I/E shows annual income at $2,936,080") in setting the Subject's 2018 assessment because of market appreciation and also since the Subject appeared to be underassessed for tax year 2017.

The assessor disagreed with Twin Lakes' suggestion that that the Subject's rental income would or should be the same as that earned or reported by Tree Haven and/or Chelsea Village for

---

[7] The table is excerpted from a worksheet which the assessor created electronically for the Subject sometime in July 2017, thus, for purposes of setting its assessment as of October 1, 2017, for tax year 2018. The assessor performed a similar computation for other Class 4Cs in the Township and used the same percentages for the adjustments and for the Cap rate as he used for the Subject.

He used an identical methodology for the Subject and the other Class 4Cs for tax year 2017. The Subject's multiplier was $5 PSF, Chelsea Village was $9 PSF, and Tree Haven was $9.75 PSF. He used the same percentages for the adjustments and for the Cap rate for all three complexes (20% for vacancy; 20% for expenses; 7.6% Cap rate) in setting their 2017 assessments.

tax year 2018, because those complexes are of the similar age, average condition (with no new improvements or renovations), and unit-size. This was because, he explained, the Subject had a much larger GBA, which then means that the Subject's rent/other income would also be greater.

He stated that it was not "typical" for him to increase a property's assessment "by approximately 100 percent," since "when you annually assess, the object is to have the assessed values close to the annual sales." He conceded that the Form AFR-A required his undertaking to "perform a ratio study to verify that, where appropriate, assessments of recently sold property are set close to recent sale prices."[8]

The assessor stated that he would not extrapolate the sale price of a commercial property to other similar commercial properties due to the infrequency of commercial property sales. When asked whether this practice could violate the Uniformity Clause of the New Jersey Constitution, the assessor responded that he complied with the law since he had independent bases to increase the Subject's assessment: here the removal of the assessment "deficit," and a concurrent reassessment on a cost PSF basis-income approach methodology.

**ANALYSIS**

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2 (c). Whether there exists a genuine issue as to a material fact in dispute requires the "motion judge" to "consider whether the competent evidential materials

---

[8] Form AFR-A is the Application for Annual Reassessment filed by an assessor to the County Board seeking its permission to perform to an annual reassessment, and certifying that the assessor will comply with the "standards and procedures" and other requirements set forth in the form.

8

presented" would allow a "rational factfinder" to decide in favor of the non-movant. Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995). In so doing, all facts must be "viewed in the light most favorable to the" non-movant. Ibid.

Here, the primary issue is a legal one: whether the assessment for the tax year 2018 was illegal (and if so, whether the succeeding years' assessments should necessarily fail as also being tainted with illegality). The material facts as to the assessment history of the Subject, its sale in November 2016, its upward revision post-sale for tax year 2018, the assessment history of the other Class 4C properties, the County Board's policies as to the ADP, the assessor's computation methodology used in setting the 2017 and 2018 assessments for the Subject and other apartment complexes, and the Chapter 91 responses, are all undisputed. As is the case in most litigated cases involving spot assessments, the issue is whether the Subject's sale was the sole reason for the 106% increase in its assessment for tax year 2018, and whether the Subject was singled out (discriminated) in this regard. As to this, each party interprets the assessor's testimony as supporting their respective positions. The court also had the benefit of hearing first-hand from the assessor. Therefore, resolving the sole legal issue in the context of the parties' summary judgment motions is appropriate here.

Twin Lakes contends that the facts show that the assessor significantly increased only the Subject's assessment for tax year 2018 solely due to its sale because (1) he had no new information as to the Subject's PGI; (2) the Subject was not improved in any manner from prior tax years (i.e., no additions or renovations); and (3) the assessor did not increase the assessments of either Tree Haven or Chelsea Village, the two most comparable apartment complexes, or of any other Class 4C property by more than 100%; all of which prove an illegal spot assessment. The Township contends the reverse, namely, that there was no spot assessment because (1) the assessor was

9

performing his required duties under the ADP; (2) the assessments of other unsold commercial properties including Class 4Cs were reassessed and thus, changed; and (3) the Subject's reassessment was computed identically as it was for other unsold comparable apartment complexes - under the income approach, using owner-provided income information, and applying uniform adjustments and Cap rates.

"Singling out" one or a select few properties for "reassessment" based solely on the purchase of those properties is a "spot assessment" which violates the New Jersey Constitution's Uniformity Clause as well the federal Constitution's Fourteenth Amendment. Twp. of West Milford v. Van Decker, 120 N.J. 354, 361-62 (1990), aff'g, 235 N.J. Super. 1 (App. Div. 1989).[9] "[U]nder no circumstances can appraised valuation of property be increased merely because it has been sold." Id. at 362. The "Welcome Stranger" pattern of spot assessments is "commonly recognized as an intentionally discriminatory practice," by reassessing only properties that were the subject of a recent sale, while leaving undisturbed the assessments of other properties in the same class that have not been sold. Regent Care Ctr., Inc. v. City of Hackensack, 362 N.J. Super. 403, 413 (App. Div. 2003).

In Centorino v. Twp. of Tewksbury, 347 N.J. Super. 256, 266 (App. Div. 2001) the Appellate Division cautioned against too liberal a view of an assessor's justification for the assessment change especially if it is subjective and strains credulity ("assessor did not rely on any legitimate non-sales related justifications, such as additions to the property or the like, for the increase" thus, a mere error in alleged erroneous building classification, "a decision made only

---

[9] In that case, the assessor "changed 751 assessments, of which 347 changes . . . were attributable to sales," and "raised the assessment of value of all of all the properties sold . . . where the value was less than the approximate 40% average ratio." Van Decker, 235 N.J. Super. at 6.

after the property was actually sold and in the absence of the original property record card" was questionable).

Van Decker and Centorino did not rule that an assessor should wholly ignore a property's sale for fear that reviewing it vis-à-vis its assessment will be deemed a spot assessment. The higher courts were cognizant of the principle that assessors are statutorily obligated to assess all property in the taxing district on an annual basis under N.J.S.A. 54:4-23. Indeed, that statute requires the assessor set a property's fair market value after "examination and inquiry." Nor did those cases rule explicitly or implicitly that it is per se wrong for an assessor to impose a changed assessment to a sold property because doing so would automatically deem the change as a spot assessment.

Thus, as aptly noted, there is "a tension between the assessor's statutory duty to assess property annually, employing his or her judgment to reflect full and fair value, N.J.S.A. 54:4-23, and the constitutional requirement that the selection of particular properties for updated assessments may not be arbitrary and discriminatory" a problem which arises usually because "assessments are not kept current." Borough of Freehold v. WNY Properties L.P./Post & Coach, 20 N.J. Tax 588, 599-600 (Tax 2003). The "assessors must, on the one hand, be alert to changed valuation factors particularly affecting individual properties in years between revaluations and make the appropriate adjustments" and "[o]n the other hand, use a valid valuation factor, which should be "reasonable and nondiscriminatory." Id. at 600. See also Property Tax Administration - Local Property, Division of Taxation, Handbook For New Jersey Assessors, §901.10 (Aug. 2022) (if "assessments do not equitably reflect property values throughout the taxing district" the assessors should "decide what to do about it" but in no event should they "adjust assessments only on properties which have sold" because that would be "'spot assessing' and is discriminatory").

11

Consequently, an assessor is not, nor should be, required to turn a blind eye to review a property's sale vis-a-vis its assessment. Thus, when the sale of a property piques an assessor's attention, instigating a review of the sold property's assessment for purposes of revising the assessment based on such review, is not per se an act or evidence of spot assessment. The assessor may choose to leave the assessment unchanged after review (for instance, the sale may be suspect as an arms-length transaction). The only caveat is that if the assessor determines that an assessment change is warranted, they must ensure that it does not run afoul of the constitutional requirements. In other words, not every assessment change after a property's sale is illegal. Rather, "it is arbitrary intentional discrimination that is unconstitutional." Van Decker, 120 N.J. at 361.

"It is [therefore] the job of the courts to analyze each factual situation and characterize the assessors' actions as prohibited or appropriate" to decide that whether the assessor "acted illegitimately and unreasonably" in a spot assessment challenge. Shippee v. Twp. of Brick, 20 N.J. Tax 427, 430, 436 (Tax 2002). As noted by this court:

> If increased assessments are based on either a sale factor or a piecemeal review of only some properties, some classes of properties or some neighborhoods, such actions may constitute impermissible spot assessments. Conversely, if an assessor has relied upon independent, legitimate, and justifiable material to conclude that such property assessments should be increased, then the actions of the assessor should withstand scrutiny.
>
> [City of Elizabeth v. 264 First Street, L.L.C., 28 N.J. Tax 408, 454 (Tax 2015) (citation and internal quotation marks omitted).]

Mindful of the above precedent, the court finds that the Subject's 2018 assessment was not an illegal spot assessment. The assessor agreed that the Subject's sale caught his attention and triggered a review of its assessment as compared to the assessments of similar Class 4Cs in the Township. Such a review is required of him as an assessor. It is true that he then changed the Subject's 2018 assessment, which was a two-fold increase as compared to the prior tax year.

However, it is undisputed that the assessor reassessed all the Class 4C properties in the Township in 2018 as was required by him under the County Board's implementation of the ADP. In doing so, he applied the same methodology to all the apartment complexes in the Township, i.e., he treated the Class 4C properties uniformly for purposes of setting the assessments. Therefore, the facts here do not align with the facts in Van Decker.[10]

Leaving aside whether the Township's annual reassessment equates to a district-wide revaluation,[11] the real issue here is whether the 106% increase to the Subject's assessment, as

---

[10] This is not to suggest that an annual reassessment undertaken by an assessor in a taxing district located in Monmouth County is immune from a spot assessment challenge. Cf. Van Decker, 120 N.J. at 362 (a taxing district "may revise assessments in years other than years of municipal-wide revaluation for legitimate reasons"). As observed:

> [W]here tax assessors and county boards correctly apply Van Decker there should generally be no necessity for an appeal. [However] . . . there is no way of knowing how often some tax assessors, in their zeal to maintain assessment records, may single out properties for increased assessment based on current sale prices, or even whether a property owner is aware of property tax law and the impropriety of such a selective increased assessment . . . [w]e doubt that any assessment would be lowered as quickly if its recent sale price was less than the assessed value.
> [Centorino, 347 N.J. Super. at 263, n.4.]

Constitutional requirements prevail over any ADP-implemented policies or regulations (but note that the AFR-A also caveats that an assessor should verify that the "assessments of recently sold property are set close to recent sale prices" but only "where appropriate"). This court has therefore considered all the undisputed facts in the record in rendering its decision.

[11] Whether an annual reassessment is equivalent to a district-wide revaluation is undecided. Two cases have deemed that it is not so for purposes of the Freeze Act. Tartivita v. Borough of Union Beach, 31 N.J. Tax 335 (Tax 2019); Pella Realty, LLC v. City of Patterson, 31 N.J. Tax 474 (Tax 2020). Cf. Bloomingdale's, Inc. v. City of Hackensack, 33 N.J. Tax 60, 80 Tax 2022) (the taxing district in Bergen County, which is a non-participant in the ADP, "was not eligible to conduct an annual reassessment program . . . under N.J.A.C. 18:12A-1.14(i)"). Legislation was proposed to overturn Tartivita, but the Freeze Act statute remains unchanged.

In Metz Family Ltd. Partnership v. Twp. of Freehold, 32 N.J. Tax 69, 81 (Tax 2020), the court allowed the municipality to join the Division of Taxation and the County Board as parties to address the issue whether annual reassessments are excepted from application of the Chapter 123 ratio under N.J.S.A. 54:51A-6(d) (the parties then resolved the issue amicably). In 2021, the statute was amended so that now the Chapter 123 ratio does not apply if a municipality has "put into operation a . . . district-wide reassessment program, compliance plan, or other form of

compared to the 2% to 20% increase in the assessments of other Class 4C properties, from tax year 2017 to tax year 2018, evidences that the Subject's 2018 was an illegal spot assessment. The court finds that it is not.

Initially, restoring the $5,549,700 "deficit" is not a credible reason to increase the Subject's assessment even if done under the aegis of the ADP. As the Township's assessor conceded, he set the Subject's assessment for each post-settlement tax year per its apparent market value and did not remove/restore that alleged deficit in those tax years. Nonetheless, this does not justify a grant of summary judgment to Twin Lakes for two reasons: One, the assessor clarified that the removal of the deficit was akin to a bookkeeping measure. This accords with the County Board's ADP-implemented policies that a property benefitting from a lower assessment for a particular tax year due to a valuation judgment, cannot continue to carry that same assessment when the market changes (upward or downward). The second reason is that he did not incorporate, add, or subtract, the "deficit" anywhere in calculating the Subject's assessment for tax year 2018. See p.7.

Next, the assessor's class-wide valuation methodology evidences that the Subject was not singled out nor treated differently than other apartment complexes in its class. The assessor reviewed the prior owner's Chapter 91 information for the Subject and other Class 4C properties, including Tree Haven and Chelsea Village, which Twin Lakes agreed were the most comparable to the Subject in terms of age, condition, and unit-size. For the Subject and these two complexes, the assessor used a PGI provided to him by the property owners to set the assessments. It is undisputed that unlike for Tree Haven and Chelsea Village or other Class 4Cs, he never received a Chapter 91 response for the Subject for purposes of setting its 2018 assessment. He therefore

---

municipal-wide assessment review that requires the revision of all property assessments to current market value, that is approved by the county board of taxation pursuant to [N.J.S.A.] 54:4-23."

reasonably used the Subject's income/expense information for calendar year 2016 that was provided to him by the prior owner as evidenced by his worksheet and notes-to-self thereto ("I/E shows annual income at $2,936,080" and that the Subject was "reassessed w/their I/E").[12]  That the assessor could have used the reported actual versus projected PGI is not proof of a spot assessment for tax year 2018.  Cf. Mountain View Crossing Investors LLC v. Twp. of Wayne, 20 N.J. Tax 612, 621 (Tax 2003) (rejecting property owner's contention that a spot assessment occurred because the assessor had prior years' income/expense information from which to set the assessment for the tax year at issue).[13]  These facts show that the assessor had an independent and credible factual basis in computing the starting point of the Subject's 2018 assessment.

Further, the assessor applied the same income-approach methodology in setting the 2018 assessments for the Subject and the other Class 4Cs in the Township, including Chelsea Village and Tree Haven.  For all Class 4Cs, he multiplied the PGI (based on the provided income/expense information) by a PSF cost multiplier.  The multipliers for the Subject, Chelsea Village and Tree Haven were relatively similar in amount: $13.5 PSF for the Subject's 214,400 SF; $14 PSF for Chelsea Village's 131,620 SF; and $15.5 PSF for Tree Haven's 126,294 SF.  For all Class 4Cs, including the Subject, the assessor used the same rate of adjustments and Cap rate.  This was the

---

[12]  The assessor deposed that he did not create the notes post-hoc for purposes of this litigation. Here, what is relevant is that he undisputedly created the worksheet in July 2017, where he used the Subject's reported projected income of about $2.9 million.

[13]  Per the Subject's prior owner's three-year NOI statement for year ending 2015, rental income (after concessions) was $2,667,172 and other income was $260,400.  This is not wildly disparate from the projected income of about $2.9 million used by the assessor.  Note that Twin Lakes' Chapter 91 response for calendar year 2018 (for use in setting the 2019 assessment) showed the potential rental income as $2,613,120, thus, about $300,000 more than the actual income of $2,305,800.  Therefore, the assessor's use of a projected PGI which was about $400,000 more than the Subject's actual rental income for 2016, was not arbitrary, capricious, or discriminatory.

same methodology he used for the prior tax year 2017 for the Subject, Tree Haven and Chelsea Village (i.e., multiplying the GBA with a PSF multiplier that was different for each property, and using the same quantum of adjustments and Cap rate).[14] There is nothing to indicate that these computations were all made after this litigation commenced. Thus, the facts show that the assessor did not single out the Subject for discriminatory treatment as compared to the other Class 4C properties in the Township when computing the Subject's 2018 assessment.

It may be true that the PGI for a Class 4C property is not usually computed on a PSF cost basis. However, an allegedly flawed methodology is not evidence of a spot or illegal assessment. Plus, the assessor did not manufacture an arbitrary PGI for the Subject - he used the projected PGI reported to him by the Subject's prior owner.

It may be that the Subject's PGI was too high because it was based on a GBA of 214,480 SF rather than 125,040 SF.[15] This possible error only speaks to a possible incorrect assessment due to possible inadvertent or careless mistakes, and is of some moment but in the context of the Subject's valuation issue. It simply does not rise to the level of evidence that an illegal spot assessment or constitutional violation occurred when the assessor set the Subject's 2018 assessment.

---

[14] The reason that the assessment for the Subject and the comparable complexes were not significantly different was due to the assessor using a $5 PSF cost multiplier for the Subject, as compared to the approximate $9 PSF for Tree Haven and Chelsea Village (at $9 PSF for the 214,400 SF GBA, the Subject's PGI would have increased by about $929,000, and with the same adjustment rates of 20% for vacancy; 20% for expenses; 7.6% Cap rate, its assessment would be closer to $16 million). That the assessor should or could have rectified the lower multiplier for the Subject in an earlier tax year does not mean that he imposed a spot assessment for tax year 2018.

[15] See n.1. The 2009 revaluation-created PRCs for Tree Haven and Chelsea Village appear to have correctly calculated their total square footage at 126,296 SF and 131,620 SF respectively. The assessor used these numbers in computing the properties' PGI for tax year 2018.

Nor is there anything suspicious in the assessor's use of a higher PSF cost multiplier for setting the Subject's 2018 assessment. He did the same for Tree Haven and Chelsea Village using cost multipliers which were relatively close to (indeed higher than) those used for the Subject. His testimony in this regard that the market was on the rise during 2017-2018 was unchallenged. It is true that the Subject's cost multiplier for the prior tax year 2017 was not similar or closer to the higher amounts used for Tree Haven or Chelsea Village. However, the assessor's correction of the same to achieve a more accurate assessment is not a spot assessment because he did not isolate assessment reviews/changes to just the Subject, and only due to its sale, while leaving alone the assessments of other unsold Class 4C properties. See e.g. Mountain Crossing, 20 N.J. Tax at 622 (that the "assessor may have been remiss in failing to increase the subject property's assessment" prior to the tax year of its sale "does not provide a basis for invalidating a proper increase in assessment once imposed"). Note that Twin Lakes never challenged or disputed, as illegal, the veracity of the cost multiplier amount. Rather, it only expressed skepticism as to the use of a cost multiplier for valuing an apartment complex under the income approach (although the same approach was used in the prior tax year 2017). Again, the skepticism may have a valid role in a valuation trial, but does not here influence the issue of spot assessment.

In sum, based on the record, the court does not agree with Twin Lakes that the Township's assessor singled out the Subject based on its 2016 sale to dramatically increase its prior assessment, and discriminated against the Subject as compared to the other Class 4C properties in the Township which were not sold. Rather, the undisputed facts show that the assessor treated all Class 4C properties in the same or a substantially similar manner, especially the ones comparable to the Subject (Chelsea Village and Tree Haven). That the increase in the Subject's 2018 assessment was more than 100% as compared to the prior tax year, or as compared to the 2% to 20%

assessment increase to the other Class 4 or 4C properties in the Township, is not a credible indicator or even proof of an unconstitutional assessment. Ibid. ("[t]he magnitude of the increase in the subject assessment as compared to . . . other apartment complex assessments does not vitiate the significance of the assessor's review and revision of these other assessments" rather it only showed that the "the assessor did not leave undisturbed the assessments of other properties in the class," therefore the Van Decker concern was absent). Indeed, the main reasons for the significance in the assessment increase for tax year 2018 were the Subject's larger GBA (derived from a 2009-created PRC) and the application of a higher PSF multiplier amount to the Subject's projected income (derived from the Subject's prior owner's Chapter 91 information).

## CONCLUSION

Based on the undisputed facts, the court denies Twin Lakes' summary judgment motion and partially grants the Township's cross-motion for summary judgment. The grant is partial since the court denies the Township's request to dismiss the complaints, each of which alleged valuation as an issue. Twin Lakes' summary judgment motion did not (nor can be implied to) concede a waiver of this cause of action. The court will therefore schedule the matters for trial on valuation.

      /s/ Mala Sundar
      Hon. Mala Sundar, P.J.T.C.

18